IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,

    v.                                        Criminal No. 1:13-cr-0422 (LMB)

TALEEK SHERROD SWINNEY,            Sentencing: February 7, 2014

            Defendant.

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Pursuant to Title 18 U.S.C. § 3553(a), the Defendant, Taleek Sherrod Swinney, hereby notifies the Court that he has reviewed the Pre-Sentence Report ("PSR"), and has no factual corrections to the report. Mr. Swinney has two objections to the proposed Sentencing Guideline calculations, which are discussed below.[1] Regardless of the advisory sentencing range, however, the parties agree that a downward variance sentence is appropriate.

Mr. Swinney submits that the mandatory minimum sentence of 180 months is appropriate in this case. Such a sentence reflects all of the § 3553(a) sentencing factors. It is also consistent with–and in many cases substantially exceeds–sentences recently imposed in this court upon similarly-situated defendants for engaging in similar conduct. While there is absolutely no dispute regarding the seriousness of the offense in this case, it is equally indisputable that Mr. Swinney is the product of an upbringing so devoid of parental direction, support and affection that he simply never had a chance in life. And while his initial reaction to being arrested by state authorities in this case was more of the same inexcusable conduct that he had engaged in prior to his arrest, he has

---

[1] Ultimately, even if both objections were granted, the advisory sentencing range would not change. Moreover, in all events the range would exceed the range of sentences permitted under the Plea Agreement in this case, which was entered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Accordingly, the Court may–but is not required to–resolve these objections. *See* Fed. R. Crim. P. 32(i)(3)(B).

while in federal custody made a clear break with that past.  He has pleaded guilty.  He has accepted responsibility for his offense.  He has not obstructed the process of this Court.  And he fully accepts that there are significant consequences for his conduct.   Those are the first steps toward fundamentally altering the course of his life.  A sentence of fifteen years in prison will reflect both the seriousness of Mr. Swinney's conduct and the fact that he has begun–and has the ability to continue–that process of redemption.

Moreover, a sentence of fifteen years is exponentially longer than any period of incarceration Mr. Swinney has previously served.  The longest custodial sentence he has previously received was one year of incarceration, *see* PSR ¶ 79, of which he served approximately eight months.  Accordingly, there is nothing in the record to suggest that a fifteen-year sentence will be insufficient to accomplish the purposes of sentencing.

**I.     Legal Standard**

Determining the proper sentence in a federal criminal case is within the discretion of the District Court.  The Court's discretion is to be exercised upon consideration of the purposes of sentencing in light of the particular case and the particular defendant before it.  The Supreme Court has emphasized that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors set forth in 18 U.S.C. § 3553(a).  *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009).  The Court's decisions in *Nelson* and *Spears* build upon its earlier decisions in *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), establishing that the Sentencing Guidelines are simply an advisory tool to be considered alongside the other § 3553(a) statutory considerations.

"Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson.* 555 U.S. at 352. "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.* (emphasis in original). In other words, sentencing courts commit legal error by using the advisory guidelines range as a default to be imposed unless a basis exists to impose a sentence outside that range.

Upon consideration of the seven co-equal factors set forth in § 3553(a), a sentencing court may find that the case falls outside the "heartland" contemplated by the guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 351 (2007). While the sentencing court must begin its analysis by correctly calculating the advisory sentencing range, the court is then free in light of the other statutory sentencing factors to impose an entirely different sentence. This is because, under *Rita,* a district court is free simply to disagree, based on the § 3553(a) sentencing factors, with the U.S.S.G.'s "rough approximation" of the appropriate sentence for any given case. *Id.*

Regardless of whether the Court calls its sentence a "variance" or a "departure," the central mandate of § 3553(a) require district courts to impose a sentence "*sufficient, but not greater than necessary,*" to comply with the purposes of sentencing set forth in § 3553(a)(2). This requirement is not just another factor to be considered along with the others set forth in Section 3553(a). Rather, it sets an independent limit upon the sentence.

**II.     Objections to the PSR's Proposed Sentencing Guideline Calculations**

*1.     Aggravating Role Enhancement*

The PSR applied, over the defendant's objection, a leader/organizer enhancement of four offense levels for Mr. Swinney's role in the offense under USSG § 3B1.1(a). *See* PSR ¶ 68; *see also* PSR Addendum at A-1. While Mr. Swinney agrees that a two-level role enhancement is appropriate under USSG § 3B1.1(c), the defense submits that the conduct justifying the role enhancement is devoid of any of the hierarchical organization and structure that would be necessary to support the four-level leader/organizer enhancement, and that the offense did not have five or more "participants" as that term is defined for purposes of § 3B1.1.[2] In support of the four-level enhancement, the PSR reasoned as follows (*see* PSR Addendum at A-1):

> The evidence supports the four-level enhancement. The criminal conspiracy lead [sic] by the defendant, involved five or more participants, and included the defendant, his mother, his cousin, and at least two other known pimps. Additionally, the defendant exercised decision making authority, recruited the victims, and claimed the largest share of the fruits of the crime. Therefore, no changes have been made to the presentence report.

With respect to the participation of each of the people supposedly led by Mr. Swinney, the PSR provided the following analysis (*see* PSR ¶ 68):

> The defendant directed the activities of his mother, who rented an apartment for CD. She also allowed the defendant to use vehicles titled in her name to prostitute victims throughout the United States. He also directed the activities of his cousin, GL, who has not been charged. According to CD, GL was the defendant's right hand man

---

[2] As calculated in the PSR, Mr. Swinney's total offense level is 47. *See* PSR Worksheet D, Line 1. Defendant's two Guideline objections would result, at most, in a reduction of four offense levels to a final offense level of 43. The resulting advisory sentencing range would in that case remain the same as is calculated in the PSR. Accordingly, the Court may but is not required to resolve defendant's objections. *See* Fed. R. Crim. P. 32(i)(3)(B).

4

> and assisted in his prostitution business. The defendant also directed the activities of another pimp, known as Prince Charming, and would have Prince Charming drive him and his prostitutes around to various appointments. The defendant also worked with RL, a known pimp in Miami, Florida, to prostitute various women in Florida. As a result, the defendant has been given a four-level increase in offense level, pursuant to U.S.S.G. Section 3B1.1 (a), for being the organizer and leader in a criminal activity that involved five or more participants.

These facts are insufficient to justify the leader/organizer enhancement, which requires both that the defendant lead a criminal organization composed of at least five participants (or that is otherwise extensive), and that he lead and direct their activities in a "hierarchical relationship." *See United States v. Quigley*, 373 F.3d 133, 139 (D.C. Cir. 2004) (distinguishing one who is merely the "hub" or "orchestrator" of concerted criminal conduct from one who is in a supervisory position over other participants, and reversing district court's application of four-level leader/organizer enhancement); *United States v. Martinez*, 584 F.3d 1022, 1026-29 (11th Cir. 2009) (district court clearly erred in applying a role enhancement because "orchestrating drug shipments" and "utiliz[ing] other individuals to mail and receive drug shipments" is distinct from exercising supervisory control over those participants) (internal quotations omitted); *United States v. Sayles*, 296 F.3d 219, 225-27 (4th Cir. 2002) (district court clearly erred in imposing a role enhancement where evidence was essentially of a buyer-seller relationship rather than one in which the supposed leader "exercise[d] decision making authority" over other participants").

According to the facts set forth in the PSR, at least one of the other participants–the defendant's cousin GL–assisted in the prostitution business and was supervised by Mr. Swinney. Those facts are sufficient to support a two-level manager/supervisor enhancement under USSG § 3B1.1(c). The other "participants" identified in the PSR, however, were not in any sort of

5

hierarchical relationship with Mr. Swinney. His mother, for example, *allowed* Mr. Swinney to title vehicles in her name for use in the prostitution business. That she "allowed" this conduct, in the wording of the PSR, is telling: it is flatly inconsistent with the mother being below Mr. Swinney in a hierarchical organization. And the two other pimps mentioned in the PSR–Prince Charming and RL–are for all practical purposes Mr. Swinney's equals. The only service that either supposedly performed at Mr. Swinney's direction was Prince Charming's driving–which was because Mr. Swinney lacked a valid operator's license. In short, Mr. Swinney had a vehicle and Prince Charming had a valid license. This allowed them to work together and each provide something the other needed. But there is no evidence of a hierarchical relationship in which Mr. Swinney directed and supervised Prince Charming and/or RL in their criminal activities.

Accordingly, the four-level enhancement applied in the PSR for Mr. Swinney's role in the offense should be overruled. Mr. Swinney's offense level should therefore be increased on the basis of his role in the offense by at most two levels pursuant to USSG § 3B1.1(c).

2.   *Acceptance of Responsibility*

The PSR both assesses a two-level obstruction-of-justice enhancement and denies a two-level acceptance-of-responsibility reduction on the basis of obstructive conduct in which Mr. Swinney engaged when he was in custody on state charges that eventually led to the instant prosecution. *See* PSR ¶¶ 69, 71. That conduct, which consisted of a series of threats made by Mr. Swinney in letters and phone calls with potential witnesses, is summarized in PSR ¶¶ 42-50. Without in any way minimizing the seriousness of that conduct, Mr. Swinney submits that the two-level obstruction enhancement appropriately accounts for it–particularly where, as here, those two levels are applied at or near the very top of the Sentencing Guidelines' Sentencing Table (where they account for

exponentially greater punishment than two levels applied lower on the Table).  Moreover, Mr. Swinney submits that his clear break from that sort of conduct since the initiation of the instant prosecution, as evidenced by his pre-indictment plea and agreement to accept a lengthy period of incarceration, should be recognized with the award of a two-level reduction for acceptance of responsibility under USSG § 3E1.1(a).

Although the Probation Officer correctly observes that conduct justifying an obstruction enhancement typically disqualifies a defendant from an acceptance reduction, *see* USSG § 3E1.1 Application Note 4, that rule is not without exception.  *Id.*  As the Guidelines recognize, this Court "is in a unique position to evaluate the defendant's acceptance of responsibility," and its determination on this point is therefore entitled to "great deference." *Id.* at Application Note 5. Here, Mr. Swinney's obstructive conduct, while serious, is separately and severely punished by the two-level enhancement applied for that conduct.  Moreover, when Mr. Swinney came into federal custody, he for the first time took the opportunity to reflect upon and to recognize the seriousness of his conduct and of the charges he was facing.  When he did so, his obstructive conduct ceased.  As noted above, he made a clear break from his past, discontinued the sort of conduct that he had previously engaged in, and made the very difficult decision to plead guilty and accept an extraordinarily lengthy period of incarceration.  In these circumstances, a two-level reduction to recognize Mr. Swinney's acceptance of responsibility is appropriate.

Indeed, Mr. Swinney's letter to the Court reflects the realization that he must make–and in fact has made–a clear break from his past: "There's also no excuse for the threats after I was incarcerated. All I can say is I was scared, But now that I've had time to think about what I've done. I can see how wrong and hurtful it was and I apologize." PSR ¶ 70.  In other words, when Mr.

Swinney was first arrested by state authorities on related charges, he remained of the same mindset that had governed his conduct on the streets. But upon recognizing and accepting the seriousness of his crimes, all of that changed. These efforts to break with his past should be taken into account in fashioning his sentence.

### III. Application of Sentencing Factors Pursuant to 18 U.S.C. § 3553(a)

*1.    Mr. Swinney's Personal History and Characteristics*

As noted above, Mr. Swinney was never given a fair shot at life. He was the product of a short-lived relationship between unwed parents. His mother's name was the only name listed on his birth certificate when he was born in 1987 at LaGuardia Hospital in Queens, New York. At the time of his birth, Mr. Swinney's mother was so unstable that his maternal grandmother almost immediately took over his care and his mother lived with them only sporadically. A few months after his birth, his grandmother took him to live with family in Tennessee, but they stayed only a few months before returning to Queens. Mr. Swinney's earliest memories of his mother include her using crack in front of him. PSR ¶ 93. In order to fuel her crack addiction, his mother worked as a prostitute, and in 1990–when Mr. Swinney was about 3 years old–she was arrested for aggravated robbery in Tennessee and sentenced to 10 years in prison. PSR ¶¶ 54, 92. Although his mother was not his primary care-giver at the time, her extended absence from any part of his life plainly impacted his development and ability to form healthy relationships.

As a young child, Mr. Swinney eventually became acquainted with his father, who had become married to another woman. When Mr. Swinney was 7 years old, he went to live with his father and his new family, which included a step-mother and two step-siblings. His time with his father was brief, however, as his step-mother did not like having a child that was not her own in her

house. She took her frustrations out on 7-year-old Mr. Swinney by beating him with a belt on several occasions. PSR ¶ 94. Physical abuse was not the only trauma that Mr. Swinney suffered. When he went back to live with his grandmother, he was sexually abused on multiple occasions by his grandmother's brother. PSR 97.

Mr. Swinney's grandmother was still his only familial refuge because shortly after his mother was released from her first incarceration, she was arrested again. In 1997, when Mr. Swinney was 10 years old, his mother was arrested for robbery in their Queens neighborhood. She again received a sentence of ten years and was incarcerated until 2006. PSR ¶ 92. Mr. Swinney's only exposure to his mother during those years was when he would take a bus, sometimes with his grandmother and sometimes by himself, to visit his mother at a women's prison in upstate New York. Unfortunately, his Queens neighborhood was so crime-ridden that he would never be alone on those bus rides, but instead, remembers making friends his own age on the bus who were going to visit their mothers.

Shortly after his mother's second incarceration, Mr. Swinney's grandmother tried to give him a more positive direction in life by moving them to Decatur, Alabama to live with her sister. PSR ¶ 96. The nearly two years that Mr. Swinney spent in Alabama were the most stable and happy of his childhood. He had escaped the neighborhood chaos of South Jamaica, Queens, was surrounded by extended family including children his own age, and received the best education of his childhood. Mr. Swinney fondly remembers enjoying nature for the first time in Alabama when his aunt taught him how to catch and clean fish. The stability Mr. Swinney found in Alabama did not last long, however, as his grandmother's health had declined and she was diagnosed as being

legally blind due to diabetes. *Id.* So his grandmother moved them back to Queens, where she had spent most of her adult life.

Unfortunately, the move back to Queens turned out poorly for Mr. Swinney: his primary care-giver was focused on her own severe medical problems; his mother was incarcerated; and his father would shortly be arrested on drug charges and sentenced to serve 157 months in federal prison. PSR ¶ 94. Since his grandmother was blind and depressed about her condition, Mr. Swinney sought refuge on the streets. He was introduced to marijuana and alcohol at 12 years old, which helped him escape his troubled home life. PSR ¶ 105. While on the streets, he started to hold drugs and guns for the neighborhood drug dealers, which was a slippery slope that led him to begin selling drugs on his own. Indeed, by the time Mr. Swinney was 17, he had dropped out of school and was arrested for possession of drugs. PSR ¶¶ 73, 106. As a close family friend explains, "it was like the streets ate him up . . . if he would have had the proper guidance he could have done something with his life." *See* Letter of Charles Gallman, attached as Exhibit 1.

As if the abandonment, abuse and neglect that Mr. Swinney suffered as a result of his family circumstances were not enough, the majority of his formative years were spent against the backdrop of one of the most impoverished, under-resourced and crime-ridden communities in the United States. South Jamaica, Queens was at the epicenter of the crack epidemic which started in the 1980s. During this time, the use of crack spread widely in inner-city New York and with it, these communities experienced a dramatic rise in violence, prostitution, child abuse, and neglect[3]–each of which was present in Mr. Swinney's personal life. In 1989, Queens ranked among the 30 poorest

---

[3] Eloise Dunlap *et al.*, *The Severely Distressed African-American Family in the Crack Era: Empowerment is not Enough*, 33 Journal of Sociology and Social Welfare 1 (March 2006).

census tracts in the nation and in 2001, the four-year graduation rate at Jamaica High School was 38.4%.[4] Additionally, the Jamaica neighborhood had one of the highest rates of incarceration in New York City.

It is unsurprising, of course, that children with family circumstances like those of Mr. Swinney experience long-term trauma leading to emotional problems which persist throughout their life.[5] And while Mr. Swinney's grandmother did her best to provide for Mr. Swinney, she was unable to prevent him from the effects of growing up with a mother in prison and an absent father, in the aftermath of the crack epidemic, while living and going to school in one of the nation's poorest and roughest neighborhoods. None of this excuses Mr. Swinney's conduct in this case, but his choices reflect the trauma he endured and the violence that has always surrounded him. As Mr. Swinney explained in his letter to the Court, "I have no excuse for the threats and violence except that it's what I've always known." *See* PSR ¶ 70.

Finally, despite his upbringing, Mr. Swinney has exhibited the motivation to be productive when given the opportunity. In his early twenties, he successfully completed a substance abuse program as a condition of probation. PSR ¶¶ 80, 105. And more recently, when he was arrested on prostitution-related charges in Stafford County in the beginning of 2013 (related to this offense), he obtained his GED at the local jail in less than four months. PSR ¶ 106. Mr. Swinney also has the

---

[4] Census Historical Poverty Table, CPH-L-189, Poverty Rates in Tracts with 30 Percent or More Poor by State: 1989, https://www.census.gov/hhes/www/poverty/data/census/1960/list.html; *Cohorts of 2001 through 2008 Graduation Outcomes*, NYC Department of Education, http://schools.nyc.gov/Accountability/data/GraduationDropoutReports/default.htm.

[5] Geri M. Lotze et al., *Moral Emotions, Emotional Self-Regulation, Callous-Unemotional Traits, and Problem Behavior in Children of Incarcerated Mothers*, 19 Journal of Child & Family Studies 1 (2010).

support of his girlfriend, who acknowledges his shortcomings and has forgiven his actions. *See* Letter of Kenya Thompson, attached as Exhibit 2.

2.  *The Need to Avoid Unwarranted Sentencing Disparities*

As noted at the outset, a sentence of fifteen years is consistent with sentences imposed recently by this Court, and by other judges of this division, upon similarly-situated defendants convicted of similar conduct. In *United States v. Snow, et al.*, 1:13-cr-0350, for example, seven of the 24 defendants appear to have been sentenced thus far. All of those, like Mr. Swinney, pleaded guilty. And while not all of their cases involve conduct substantially similar to that at issue here, four of them do:[6]

> *i) Deontae Holland:* Mr. Holland was the second-in-command of a violent, far-reaching, and well-organized criminal gang. In his role as second-in-command, he oversaw the gang's violent prostitution and drug distribution businesses (which violence included, among other things, the administration on gang orders of a "buck fifty" facial wound to a person who had allegedly stolen from the gang). This Court imposed a total sentence of 180 months (equal to that requested here).[7]

---

[6] For each of the cases discussed in this section, the relevant information is drawn from the Superseding Indictment, the Statement of Facts and/or the Government Position on Sentencing in each case. None of the sentences appear from the public record appear to be based on "substantial assistance" reductions pursuant to either USSG § 5K1.1 or Fed. R. Crim. P. 35(b).

[7] The advisory guideline range in Mr. Holland's case was 235-293 months. It is unclear why the range would be lower for someone like Mr. Holland than for Mr. Swinney, given that Mr. Holland had managed and supervised a violent prostitution business akin to Mr. Swinney's *in addition to a substantial and violent drug distribution enterprise* that is entirely absent in this case. Perhaps the disparity between the applicable guideline ranges is due to the different offenses of conviction. But regardless of the reason, the disparity illustrates the utter arbitrariness of the Sentencing Guidelines in certain instances.

*ii) Nicole Yates:* Ms. Yates was the "madam" of the gang's violent prostitution business, responsible for overseeing the prostitutes. She personally assaulted at least one of the prostitutes as punishment for asking that she not be forced to have sex with any more customers on a particular day. This Court imposed a total sentence of ten years.

*iii) Markeith Kerns:* Mr. Kerns aided the gang's violent prostitution business by "guarding" the prostitutes (presumably to prevent them from running away). He also was involved in an incident of violence on behalf of the gang in which he fired several shots at a vehicle and its occupants over a gang-related dispute. This Court imposed a total sentence of ten years.

*iv) Janee Yates:* Ms. Yates was involved in both the gang's prostitution and drug businesses, and was one of the two gang members who personally carried out the "buck-fifty" face-slashing discussed above. This Court imposed a sentence of ten years.

A review of similar cases sentenced recently by other Judges of the Alexandria division reveals sentences entirely consistent with those imposed thus far in the *Snow* matter. In *United States v. Dumas*, 1:13-cr-286, for example, Mr. Dumas was convicted at trial of participation in a multi-state conspiracy to prostitute at least seven underage girls. Mr. Dumas reportedly was a key player in the conspiracy, and was responsible for–among other things–obtaining illegal drugs to keep the underage prostitutes high, and providing the "muscle" (and carrying a gun) for the organization (which relied on violence when drugs proved insufficient to keep the prostitutes in line). Moreover, the prostitution enterprise in the *Dumas* matter, as in the instant case, kept every penny the

13

prostitutes earned. Mr. Dumas did not accept responsibility for his offense, but instead was found guilty at trial. Nonetheless, Judge Lee declined to impose the 30-year sentence requested by the government and last month imposed a total sentence of ten years.[8]

Similarly, in *United States v. Holmes*, 1:13-cr-278, the defendant was convicted of prostituting a fifteen-year-old minor, who he also had sex with on a number of occasions. The minor was subjected to violence at the hands of a customer, and to multiple instances of statutory rape at the hands of both the defendant and her customers. Mr. Holmes, after attempting to withdraw his guilty plea before sentencing, was sentenced by Judge O'Grady to 14 years in prison. The co-defendant in that case, Stephanie Chapman, who recruited the fifteen-year-old victim and assisted in prostituting her, was sentenced last week by Judge O'Grady–after being convicted at trial–to a term of 11 years.

## **CONCLUSION**

For the foregoing reasons, Mr. Swinney submits that a sentence of 180 months is sufficient to accomplish the purposes of sentencing. Further, in light of Mr. Swinney's financial condition and significant restitution obligation, he lacks the ability to pay a fine. *See* PSR ¶ 111. Finally, Mr. Swinney requests that the Court recommend that he be incarcerated as close as possible to the New York City metropolitan area.

---

[8] In the related case of Koya Rooke, who was charged in the same case as Mr. Dumas and also convicted at trial and sentenced last month, Judge Lee also declined to impose the lengthy (27-year) sentence requested by the government and instead imposed the mandatory-minimum sentence of 10 years. Ms. Rooke's role in the offense was substantially different than Mr. Dumas's, however, in that she principally assisted by doing things like booking hotel rooms and placing internet advertisements. Her case is therefore not particularly analogous to the instant case.

Respectfully submitted,

TALEEK SHERROD SWINNEY

By Counsel,

Michael S. Nachmanoff,
Federal Public Defender


By:    /s/                     
Michael S. Nachmanoff
Va. Bar # 39180
Federal Public Defender
Todd M. Richman
Va. Bar # 41834
Assistant Federal Public Defender
Attorneys for Taleek Sherrod Swinney
1650 King Street, Suite 500
Alexandria, Virginia   22314
(703) 600-0860 (telephone)
(703) 600-0880 (facsimile)
Michael_Nachmanoff@fd.org (email)

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2014, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to:

Michael J. Frank, Esq.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

A copy of the foregoing Memorandum will also be served upon Senior United States Probation Officer Karen Riffle via electronic mail.

/s/
Todd M. Richman
Va. Bar # 41834
Assistant Federal Public Defender
Attorney for Taleek Sherrod Swinney
1650 King Street, Suite 500
Alexandria, Virginia  22314
(703) 600-0845 (telephone)
(703) 600-0880 (facsimile)
Todd_Richman@fd.org (email)